FILED

2014 May-19  AM 10:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ED RUDY, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 2:12-cv-00696-JEO** |
| | ) | |
| WALTER COKE, INC., and | ) | |
| WALTER ENERGY, INC., | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Plaintiff Ed Rudy brings this action asserting that Defendants Walter Coke, Inc., ("Walter Coke") and Walter Energy, Inc., ("Walter Energy") terminated his employment to prevent him from using his health benefits for necessary surgery and in retaliation for using his leave under the Family and Medical Leave Act of 1993 ("FMLA").  The defendants have filed a motion for summary judgment as to both claims.  (Doc. 19).[1]  The court conducted oral argument on May 12, 2014.  Upon consideration, the court[2] finds that the motion is due to be granted.

## I.    SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE a party is authorized to move for summary judgment on all or part of a claim asserted against the movant.  Under that rule, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.  56(c).  The party moving for summary judgment "always bears the initial

---

[1] References herein to "Doc. ___" are to the electronic record maintained by the Clerk of the Court.

[2] The parties have consented to the exercise of plenary jurisdiction by a magistrate judge.  *See* 28 U.S.C. § 636(c); LR 73.2.  (Doc. 25).

responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A), (B).  Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations ... , admissions, interrogatory answers, or other materials."

At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Accordingly, in its review of the evidence, a court must credit the evidence of the nonmovant and draw all justifiable inferences in the non-movant's favor.  *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).

II.    FACTS[3]

    A.    **Background**

Walter Energy is the holding company for Walter Coke.  (Scott Castleberry Dec.[4] at ¶ 4).

It is a Delaware corporation headquartered in Birmingham.  (*Id*. at ¶ 3).  It has no employees.

(*Id*. at ¶ 4).  Walter Coke, formerly known as Sloss Industries, manufactures coke for use in blast

furnaces and foundries for the production of steel.  (*Id*. at ¶ 8).  The plaintiff initially was

employed by Walter Coke in January 2000 as a ceramic welding[5] technician.  (Undisputed Fact at

¶ 34).[6]

    Scott Castleberry is the general manager of the Coke Division at Walter Coke.

(Castleberry Dep. at 9).[7]  He oversees operations, maintenance, sales, and safety for Walter Coke.

He is also responsible for hiring and firing.  (*Id*. at 6).  John Belcher, the Emissions Coordinator,

is the plaintiff's direct supervisor.  (Undisputed Fact at ¶ 13).  Belcher reports to Hewey Lawson,

the Oven Area Emissions Control Coordinator.  (*Id*. at ¶ 14).

    Walter Coke provides its employees with its Rules of Conduct and Safety ("the Rules") at

hiring.  Additionally, they are displayed on the bulletin board in the employee break room.  (*Id*. at

---

[3]The background set forth in this section represents the facts and circumstances as discerned by the court from the pleadings and the parties' respective evidentiary submissions, in light of the relevant summary judgment standard requiring that the record be viewed in the light most favorable to the nonmoving party.  Accordingly, these are the "facts" for purposes of summary judgment only; they may not be the actual facts.

[4]Castleberry's declaration is found at document 21-2.

[5]Ceramic welding is the process by which the gouges and cracks in the bricks of a coke oven are welded so that the oven maintains optimal temperature.  (Plaintiff's Dep. (Doc. 21-3 at 44-45).

[6]The undisputed facts are located at document 20, paragraphs 1-46, 48-50, 54-59,62-66, 68-71, 74-77, and 80-82.  (See also doc. 22 at 1-2).

[7]Castleberry's deposition is located at document 21-1.  Page references are to the deposition pages, not the court's electronic numbering system.

¶ 15).  The Rules set forth examples of prohibited conduct, including actions that are terminable offenses.  (*Id*. at ¶ 16).  Prohibited conduct includes "fighting, threatening, intimidating, coercing, or interfering with co-workers;" "violation of safety or operating rules;" and "horseplay."  (*Id*. at ¶ 17).  The plaintiff acknowledges that he is aware of the Rules and the importance of the same.  (*Id*. at ¶¶ 18-21).

Walter Coke provides its employees with a group health benefits plan through Blue Cross/Blue Shield of Alabama.  (*Id*. at ¶ 22).  The plaintiff was a Plan participant.

Walter Coke also has an FMLA policy.  The policy is provided to the employees and informs them of their rights under the FMLA and the eligibility requirements.  (*Id*. at ¶¶ 25-26).  It requires employees to give 30 days written notice if the need for leave is foreseeable.  (*Id*. at ¶ 27).  The plaintiff requested and was provided FMLA leave in the past, including November 2003.  (*Id*. at ¶¶ 28-29).  He was off from work from November 2003 until January 2004; from the end of July 2005 through September 12, 2005; and for four months in 2009 for back surgery – from June 15, 2009 through October 7, 2009.  (*Id*. at ¶¶ 30-32; Rudy Dep.[8] at 37-39).

To perform his job, the plaintiff used a welding machine that was connected to an air hose, a material hose, and an oxygen line.  (Undisputed Fact at ¶ 37).  The air hose connects to the welding machine at a "T" joint.  (*Id*. at ¶ 38).  The material hose and the oxygen line connect to each other at a "Y-gun," which is then connected to the welder via another hose.  (*Id*. at ¶ 39).  Typically, because of the extreme heat, an individual welder works for approximately one hour in an assigned area.  Then he takes a break, removing his equipment, and returns to the job until the assignment is completed.  (*Id*. at ¶ 40-41).

---

[8]The plaintiff's deposition is located at document 21-3.

The plaintiff hurt his back again in mid-summer 2010,[9] while he was moving 55-pound bags of silica powder.  (Rudy Dep. at 26, 40).  He told his supervisor, Belcher, about the problem.  (*Id*. at 32, 41).  Belcher told him to be careful.  (*Id*.)  According to the plaintiff, Belcher also stated, "[H]ere we go again."  (*Id*. at 102).  Lawson also saw him about this time and the plaintiff told him that he hurt his back.  Lawson "chuckled and said [to] go sit in there, take it easy for a while and be careful."  (*Id*. at 28).  The plaintiff went back to see his doctor, Dr. Minor,[10] about three weeks later on August 19, 2010.  (*Id*. at 33-34, 40).  He was referred to Dr. Clark who ordered a mylogram on September 23, 2010.  (*Id*. at 49).

### B.    The Termination

On September 22, 2010, during a break at work, ceramic welder Galean England observed the plaintiff pack a piece of wool into the "T" of Richard Fendley's welding machine.  (*Id*. at ¶ 42).  England informed Fendley of the event.  (*Id*. at ¶ 43).  Fendley in turn told Benny Layne, who examined the equipment.  Layne located "wool stuffed inside the attachment." (Layne Statement).[11]  After that, Layne told Belcher what he had found.  (Undisputed Fact 48). Belcher took the "T" fitting with the wool still in it to Castleberry, telling him what Layne and Fendley had told him.  (*Id*. at ¶ 49).  Castleberry decided at that time that he was going to terminate the plaintiff's employment if he had, in fact, placed the wool in the welding machine. (Castleberry Dec. at ¶ 18).

On the next day, September 23, 2010, Castleberry obtained statements from Fendley and

---

[9]A more specific date is not evident in the record.  This deficiency is not material to the court's ultimate determinations on the motion for summary judgment.

[10]Minor is also referenced as Mintor in the record, particularly the plaintiff's brief.  (See Doc.   at 3).

[11]Layne's statement is located at document 21-11.

Layne concerning the placement of the wool in the line.  (Undisputed Facts at ¶ 54).  The plaintiff was not working that day because he had a doctor's appointment.  (*Id*. at ¶ 56).  Castleberry then told Belcher to contact the plaintiff and to have him report to Castleberry's office on September 27, 2010.  (*Id*. at ¶ 55).

On September 24, 2010, the plaintiff returned to his doctor to learn that he would need back surgery for a disc fusion.  (*Id*. at ¶ 58).  That same day, he was called by Belcher and told to report to Castleberry's officer on September 27.  (*Id*. at ¶ 59; Rudy's Dep. at 56).  During the conversation, Belcher asked about the doctor's visit.  The plaintiff told him it was not good and he would have to have surgery and time off from work.[12]  (Ruby Dep. at 52, 55-56).

The plaintiff returned to work on September 27, 2010.  He met with Castleberry and Mark Scott, an Area Manager.  During their meeting, the plaintiff admitted placing the wool in the "T" of Fendley's welder.  (Undisputed Fact at ¶ 63).  The plaintiff characterized it as a "prank" in his signed statement.  When Castleberry and Scott told the plaintiff it could be a safety issue, he responded that pranks had been going on for a long time – years, and no one had done anything about them.  (Rudy Dep. at 59).  He did not see any harm in it because he did not intend to harm anyone or anything.  (*Id*.)  He also acknowledged that doing what he did was a safety violation.  (Undisputed Fact at ¶ 66).  He also told Castleberry that supervisors at Walter Coke knew of other such instances occurring as a practical joke.  (*Id*. at ¶ 69).  He did not, however, provide Castleberry with any names of such persons.  (*Id*. at ¶ 70).  Castleberry told the plaintiff he wanted to talk with Ron Schoen, the Vice President of Operations, about the situation, and asked the plaintiff to return the next day.  (*Id*. at ¶ 74).

---

[12]Belcher disputes this. (Belcher Dec. (Doc. 21-4) at ¶ 19).

Castleberry talked with Schoen, who agreed with his recommendation of termination. (*Id*. at ¶ 75).

The following day, September 28, 2010, Castleberry met with the plaintiff and gave him the choice of either resigning or being terminated.  (*Id*. at ¶ 76).  Because the plaintiff was unwilling to resign, Castleberry terminated his employment.  (*Id*. at ¶ 77).  He was provided notice of his entitlement to COBRA benefits.  He elected to receive them, and he was provided with the benefits.  (*Id*. at ¶¶ 81-82).

## III.   DISCUSSION

### A.   Walter Energy

Defendants first argue that the plaintiff's claims against Walter Energy are due to be dismissed because it is not an employer under either act and because it did not employ him. (Doc. 20 at 15-17).  The plaintiff does not dispute these contentions.  In fact, this is undisputed according to the parties.  (Doc. 20 at ¶ 5; Doc. 22 at 1).

First, as to the FMLA claim, the record is clear that Walter Energy does not employ 50 or more employees.  It is simply a holding company.  Accordingly, summary judgment is due to be granted as to this claim. *Walker v. Elmore County Bd. of Educ*., 379 F.3d 1249, 1250 n.1 (11th Cir. 2004) ("The act defines 'employer' as 'any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year.'  29 U.S.C. § 2611(4)(A)(i).").  Second, as to the ERISA claim, the record is similarly clear that Walter Energy did not employ the plaintiff for purposes of ERISA.  Accordingly, summary judgment is due to be granted on this claim as well. *Donovan v. Dillingham*, 688 F.2d 1367, 1371 n.1 (11th Cir.

1982) ("The term 'employer' means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity."  ERISA § 3(5), 29 U.S.C. § 1002(5).)).

B.     **The Substantive Claims**

1.     **FMLA Claims**

Although this is the last claim in the complaint, the court chooses to address it first because of the manner in which the parties briefed the same.  The plaintiff alleges that Walter Coke unlawfully terminated him after he told his supervisor he needed back surgery and leave from work.  (Doc. 1-1 at 7 of 7).  The defendant[13] asserts that the plaintiff cannot establish a prima facie claim of retaliation and, that, even if he could, he has not shown the defendant's reason for his termination is pretext.  (Doc. 20 at 19-22).  The plaintiff retorts that he is bringing two claims under the FMLA – an interference claim and a retaliation claim.  (Doc. 22 at 6).  The defendant replies that he is barred from using his responsive brief to advance a new claim for interference and because the claim lacks merit.  (Doc. 23 at 2).

a.     **The Interference Claim**

i.     **As a new cause of action**

The Eleventh Circuit has held that a plaintiff cannot raise a new claim in response to a summary judgment motion.  *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (the plaintiff could not raise a contract claim follow the filing of a motion for summary

---

[13]The court will use the term "the defendant" to refer to Walter Coke in view of the fact that the relevant arguments apply to it and not Walter Energy.

8

judgment on his tort claims). In *Hulbert v. St.Mary's Health Care Sys.*, 439 F.3d 1286 (11th Cir. 2006), the plaintiff's complaint alleged FMLA interference and retaliation claims predicated on his medical condition. In response to a motion for summary judgment, the plaintiff asserted that he was also entitled to FMLA relief premised on the serious health condition of his mother. *Id.*, at 1297. Rejecting this argument, the court stated that a plaintiff is prohibited from advancing a new claim at summary judgment when that claim raises "an additional, separate statutory basis" for entitlement to damages that was not in the original complaint.[14] *Id*. The court further stated that Hulbert's additional claim was a "fundamental change" that he "was not entitled to raise in the midst of summary judgment." *Id*.

In the present instance, the ERISA claim in the complaint contains the heading "ERISA Interference/Retaliation Clause." (Doc. 1-1 at 6). The FMLA heading, in contrast, simply states: "Violation of FMLA." *Id*. The FMLA claim also alleges little thereafter, stating after the incorporation of prior allegations, "Plaintiff alleges that he requested fml [sic] leave for a serious medical condition and that he was terminated for requesting time to take off to have surgery for a serious medication condition, in violation of his rights under the [F]amily [M]edical [L]eave [A]ct." *Id*. at 7. However, under the circumstances, the court is not convinced that the defendant had "no notice whatsoever" to believe that the claim included entitlement to relief for interference with his right to leave. The complaint clearly provides the defendant with notice that the FMLA was allegedly violated premised on the plaintiff's allegations that he notified the defendant of his need for leave for the surgery and his subsequent termination. The court cannot

---

[14]Hulrbert's interference claim was his alleged serious health condition, which was based on 29 U.S.C. § 2612(a)(1)(D), while any claim for his mother's serious health condition would be premised on 29 U.S.C. § 2612(a)(1)(C). *Hurlbert*, 439 F.3d 1297.

find that the plaintiff "effected a fundamental change" in the nature of his claim for relief during the summary judgment process. Thus, he was not required to amend his complaint. This aspect of the motion, accordingly, is due to be denied.

### ii.     No evidence of the denial of a substantive right

The defendant next argues that should the court find that the interference claim is adequately pled, summary judgment is still due to be granted because the plaintiff has not presented substantial evidence that he was denied a substantive right under the FMLA. (Doc. 23 at 3). In support of this contention, the defendant simply states "Rudy foregoes arguing this point altogether." (*Id*.)

> The party moving for summary judgment
>
> bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment.

*Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir. 1991); *see also Celotex Corp.*, 477 U.S. 317; *Adickes*, 398 U.S. 144. Where the movant for summary judgment will not bear the burden of proof on a claim or issue at trial, the movant can satisfy this initial burden of production at summary judgment by pointing to specific portions of the record materials on file that either negate an essential element of the non-movant's claim or that affirmatively indicate "that the party bearing the burden of proof at trial will not be able to meet that burden." *Clark*, 929 F.2d at 608; *see also United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama*, 941 F.2d 1428, 1438, n.19 (11th Cir. 1991) (en banc). However, "it is never enough simply to state that the non-moving party cannot meet its

burden at trial," *id.*, or to make "a conclusory assertion that the plaintiff has no evidence to prove his case." *Four Parcels*, 941 F.2d at 1438 n.19 (quoting *Celotex*, 477 U.S. at 328 (White, J., concurring)).

In its opening summary judgment brief with regard to whether the plaintiff has a substantive right under the FMLA, the defendant states, "Even if Mr. Rudy simply stating to Mr. Belcher that he may need surgery is protected activity under the FMLA, Mr. Rudy's claim fails as a matter of law because he cannot present substantial evidence that the decision to terminate him was causally related."  (Doc. 20 at 23).  The defendant then argues that because Belcher told Castleberry of the violation and Castleberry decided to terminate the plaintiff before he informed Belcher of his need for surgery and leave, the causal connection cannot be established.

"An employer may not 'interfere with, restrain, or deny the exercise of or the attempt to exercise, any right' under the FMLA."  *Chappell v. Bilco* Co., 675 F.3d 1110, 1115 (8th Cir. 2012) (citing 29 U.S.C. § 2615(a)(1)).  To state a claim of interference with a substantive right, the plaintiff need only demonstrate by a preponderance of the evidence that he was denied a benefit he was entitled under the FMLA.  *Martin v. Brevard County Public Schools*, 543 F.3d 1261, 1266-67 (11th Cir. 2008); *Strickland v. Water Works and Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206-07 (11th Cir. 2001); *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1353-54 (11th Cir. 2000).[15]  The defendant's motives are irrelevant.  *Martin*, 543 F.3d at 1267.  However, "the FMLA is not a strict liability statute, and an employer is not

---

[15]The Sixth Circuit Court of Appeals has enumerated the elements of an interference claim as follows: (1) the plaintiff was an eligible employee; (2) the defendant was an employer subject to the FMLA; (3) the plaintiff was entitled to leave under the FMLA; (4) he gave his employer notice of his intention to take FMLA leave; and (5) the defendant denied him FMLA benefits to which he was entitled.  *Romans v. Michigan Dept. of Human Services*, 668 F.3d 826, 840 (6th Cir. 2012).

11

liable for interference if an adverse employment decision was unrelated to the employee's use of [or request for] FMLA leave." *Verby v. Paypal, Inc.*, 2014 WL 1689684, *13 (D. Neb. April 29, 2014). "[A]s long as an employer can show a lawful reason for termination, *i.e.*, a reason unrelated to an employee's exercise of FMLA rights, any resulting interference with the employee's FMLA leave rights will be justified." *Id*. at 14.

> Among the substantive rights granted by the FMLA to eligible employees are the right to "12 workweeks of leave during any 12–month period .... [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee," 29 U.S.C. § 2612(a)(1), and the right following leave "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to an equivalent position, 29 U.S.C. § 2614(a)(1).

*Strickland*, 239 F.3d at 1206.

Here, the plaintiff's evidence is that he hurt his back lifting at work for a second time in around mid-summer 2010. He went to see his doctor on August 19, 2010, who sent him to see another doctor for a mylogram on September 23, 2010. On September 24, 2010, the plaintiff for the first time informed Belcher during a telephone call after his doctor's visit of his need for surgery and for leave. Thus, while he has demonstrated for summary judgment purposes a request for substantive benefits under the FMLA, the concomitant question is whether he was terminated for an independent reason.

The court finds that the evidence, when viewed in a light most favorable to the plaintiff, is insufficient to support an interference claim because there is nothing to show that Castleberry was aware of the plaintiff's need for surgery or for any type of leave at the time of his decision to terminate the plaintiff. To the contrary, as just cited, the undisputed evidence shows that Castleberry learned of the offending conduct before the plaintiff went to the doctor. Castleberry

conducted his investigation and made his termination decision before the plaintiff told Belcher of his need for surgery and leave.  He told Belcher to call the plaintiff and to have him report to Castleberry when he returned to work.  It was after all of this that Belcher called the plaintiff and then learned of his medical situation.  Thus, the interference claim must fail as a matter of law.[16]

### b.      Retaliation Claim

In the initial briefing on the plaintiff's retaliation claim, the defendant asserts that its motion for summary judgment is due to be granted because (1) the plaintiff cannot establish a prima facie case that the termination is causally related to the request for FMLA leave and (2) he cannot demonstrate that the reason for his termination – a safety violation – is pretext.  (Doc. 20 at 20-21).  In response, the plaintiff argues (1) he should not have to argue the prima facie case, (2) the defendant's reason was pretext, and (3) the defendant is precluded from challenging his claim because of the determination of the state court at his earlier unemployment compensation hearing.  (Doc. 22).  These assertions will be addressed separately below.

### i.      Prima facie case

### a.      The law

To prove FMLA retaliation, the plaintiff must show that the defendant employer intentionally discriminated against him for exercising an FMLA right.  *See* 29 U.S.C. § 2615(a)(2); 29 C.F.R. § 825.220(c); *see also Martin v. Brevard County Public Schools*, 543 F.3d 1261, 1267 (11th Cir. 2008).  "Unlike an interference claim, an employee 'bringing a retaliation claim faces the increased burden of showing that his employer's actions were motivated by an

---

[16]To the extent the plaintiff intersperses arguments in support of his position concerning the causal connection on the interference claim in his brief under the pretext heading concerning the retaliation claim, they have been considered and will be discussed below.

impermissible retaliatory or discriminatory animus.' " *Id.*, 543 F.3d at 1267-68 (citing *Strickland*, 239 F.3d at 1207 (internal quotation marks omitted)).  Absent direct evidence of retaliatory intent, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), controls.  *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000).  The plaintiff must show that (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment decision, and (3) the decision was causally related to the protected activity.  *Id.*  Once the plaintiff establishes his prima facie case, the burden shifts to the defendant "to articulate a legitimate reason for the adverse action."  *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).  If the defendant employer makes the requisite showing, the plaintiff must then show that the proffered reason was pretextual by presenting evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  *Id.* at 1298 (internal quotation marks omitted).  The employee may rely on evidence that he already produced to establish his prima facie case.  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997); *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 921 (11th Cir. 1993), or he may present additional evidence.

### b.      Analysis

At the outset, the court rejects the plaintiff's proposition that he need not address the defendant's contention that he failed to establish a prima facie case.  (See Doc. 22 at 11).  Simply articulating its purported legitimate reason for the termination does not preclude the defendant

14

from challenging the plaintiff's prima facie case.[17]

Turning to the defendant's assertion, it initially challenges as it did regarding the interference claim, the third element of the prima facie case – casual relationship.  (Doc. 20 at 20).  It argues that the plaintiff cannot present substantial evidence that the decision to terminate him was causally related to his request for leave.  Specifically, the defendant argues that Castleberry made the decision to terminate the plaintiff on September 22, 2010, "unless his investigation showed he did not commit the conduct."  (Doc. 20 at 23 (citing Castleberry Dec. at ¶ 18)).  The defendant supports this contention by demonstrating that on September 23, 2010, Castleberry confirmed the conduct through witness interviews (*id*. (citing *id*. at ¶ 19)) and the plaintiff did not tell Belcher of his need for surgery until September 24, 2010 (*id*. (citing Rudy's Dep. at 56-58, 91).  The defendant concludes that because the protected activity did not occur until after the termination had been set in motion, the plaintiff cannot establish a causal connection.  (*Id*.)

The plaintiff retorts that the causal relationship and the evidence of pretext has been demonstrated in various way.  First, according to the plaintiff, they are evident in Belcher's comment, "[H]ere we go again.," that was made when he learned earlier in the summer that the plaintiff's back was bothering him again.  (Doc. 22 at 13).  He further asserts that "it matters not" that the decision maker, Castleberry, denies knowing that the plaintiff requested FMLA leave because Belcher was aware of it, he harbored the bias, and he "initiated the termination process

---

[17]To the extent that the defendant argues in its reply brief that it is entitled to summary judgment because the plaintiff "present[ed] no argument to support ... a prima facie case, he concedes he cannot present one," the court disagrees for two reasons.  (Doc. 23 at 2).  First, the court still has a duty to ensure the defendant is entitled to summary judgment on the claim.  Second, although not ideally organized, the plaintiff's brief addresses the elements of a prima facie case.  He argues he told Belcher about the surgery and the need for leave (doc. 22 at 9, 11-12), he clearly states he was terminated (*id*. at 11), and the two were causally related according to the plaintiff (*id*. at 11-22).

and probably was involved in the decision making to terminate Rudy." (*Id*. at 14).  The plaintiff is in essence arguing, at least in part, that he can demonstrate the causal relationship and retaliatory animus under the "cat's paw" theory.  (Doc. 22 at 14 (citing *Staub v. Proctor Hosp.*, 562 U.S. ---, 131 S. Ct. 1186, 1194 (2011))).  *See also Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (causation may be established under the "cat's paw" theory in a Title VII case).  "'Cat's paw' theory of liability, also referred to as 'subordinate bias theory,' is liability seeking to hold an employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision."  *Sims v. MVM, Inc.*, 704 F.3d 1327, 1335, n.6 (11th Cir. 2013) (citing *Staub*).

Starting with Belcher's comment, the evidence shows the plaintiff hurt his back in mid-summer 2010.  Belcher was aware of it and made the above comment concerning the matter.  The plaintiff placed the wool in the "T" of Fendley's equipment and Belcher learned of the situation on September 22, 2010.  He informed Castleberry of the event on the same day.  As previously discussed, Castleberry decided at that time to terminate the plaintiff if he determined that the plaintiff had done the purported act.  (Castleberry Dec. at ¶ 18).  Castleberry obtained statements the following day from Fendley and Layne confirming the situation.  (*Id*. at ¶ 19).  He then told Belcher to call the plaintiff to have him report to Castleberry on September 27, 2010, when he returned to work.  Belcher then called the plaintiff and learned of his need for back surgery and leave.

When the plaintiff returned to work on September 27, he went to see Castleberry.  He admitted placing the wool in the "T", asserting it was only a prank.  (*Id*. at ¶¶ 26-27).  Castleberry remained satisfied with his earlier decision to terminate the plaintiff so he went to see

16

the Vice President of Operations, who agreed with his decision.  (*Id*. at ¶¶ 31-32).  The plaintiff was terminated the very next day – September 28, 2010.

The plaintiff argues that Belcher's mid-summer comment constitutes evidence of discriminatory intent if it was made by a decision maker.  The court agrees to the extent it is circumstantial evidence this court should consider and a jury would be entitled to hear and draw any reasonable inference from if the matter were to go to trial, but only if it was made by a decision maker.  It is not an "isolated comment" as suggested by the defendant.  (See Doc. 23 at 3-4).  Having said that, there is no evidence in the record that Belcher was the decision maker.  Belcher was made aware of the plaintiff's conduct and brought the matter to the attention of Castleberry for his review.  This alone is not enough to attribute the purported discriminatory animus of Belcher to Castleberry or the defendant.

Thus, the next question is whether the actions of Belcher are attributable to Castleberry under *Staub*.  The plaintiff argues that Castleberry is a mere cat's paw[18] for Belcher's discriminatory animus and, accordingly, the defendant is liable.  To so find, there must be some showing that Belcher's actions are the proximate cause of the termination.  *Id.*  In *Staub*, the Supreme Court held that an employer could be liable under the Uniformed Services Employment and Reemployment Rights Act of 1994 only if the subordinate supervisor such as Castleberry (1) performs an act motivated by discriminatory animus that is intended to cause an adverse employment action, and (2) that act is a proximate cause of the ultimate employment action.  *Staub*, 131 S. Ct. at 1194; *Sims*, 704 F.3d 1335.  Accordingly, an employer will be liable only if

---

[18] The term "cat's paw" is derived from one of Aesop's fables, in which "a monkey induces a cat by flattery to extract roasting chestnuts from the fire.  After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing."  *Staub*, 131 S. Ct. at 1190, n. 1.

the actions of an unlawfully motivated supervisor are a proximate cause of the termination. *Id*.

"Cat's paw" liability generally is not appropriate where the decision maker is not a mere "rubberstamp" of the offending supervisor, but conducts an independent investigation of the events. *See Sirpal v. University of Miami*, 509 F. App'x 924 (11th Cir. 2013) (stating this case is not a cat's paw situation because the independent investigation determined that dismissal was, apart from the recommendation, entirely justified); *but see King v. Volunteers of America, North Alabama, Inc.*, 502 F. App'x 823, 828 (11th Cir. 2012) (holding that plaintiff had demonstrated potential liability under a "cat's paw" theory where offending supervisor made statements that she would engineer the plaintiff's termination and that the decision maker rubber-stamps her recommendations).  However, *Staub* did note that bias can be imputed to a decision maker, even if there is an independent investigation, if the decision maker "relies on facts provided by the biased supervisor," by "effectively delegat[ing] the factfinding portion of the investigation to the biased supervisor."  *Staub*, 131 S. Ct. at 1193.

In the present case, the plaintiff has not shown any facts warranting application of "cat's paw" responsibility.  There is no evidence in the record that Belcher made a recommendation to Castleberry.  Additionally, the record demonstrates that Castleberry conducted an independent investigation and terminated the plaintiff premised on a "safety violation."  Specifically, he received Belcher's information and then interviewed Fendley, Layne, and England.  They confirmed the events involved in the incident.  Castleberry then met with the plaintiff who confirmed that he had placed the wool in Fendley's equipment.  Castleberry did not accept the plaintiff's characterization of the conduct as a "prank," and instead found it was a safety violation.  Still further, he discussed his decision with Vice President of Operations Ron Schoen,

who concurred in Castleberry's recommendation.  This is not an instance where any purported knowledge or animus on Belcher's may be attributed to Castleberry to impose liability on the defendant.

The plaintiff next argues that he has demonstrated a causal relationship because of the close proximity between the protected activity and the adverse employment action.  (Doc. 22 at 18) (citing *Brungart*, 231 F.3d 791)).  The defendant recognizes the premise, but argues that the present case is excepted from the general rule because the decision maker – Castleberry – did not have knowledge that Rudy engaged in protected conduct – requesting medical leave.  (Doc. 23 at 6 (citing *Brugart*, 231 F.3d at 799 (noting "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct")).  *See also Parks v. UPS Supply Chain Solutions*, *Inc*., 2014 WL 414230, *11 (E.D. Ky. February 4, 2014) (stating "the law is clear that timing alone cannot establish pretext"); *Miller v. Northwest Airlines, Inc*., 2013 WL 5425420 (D. Minn. 2013) ("A 'mere coincidence of timing' can rarely be sufficient to establish a submissible case of retaliatory discharge." (citing *Kipp v. Missouri Highway and Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002))).

As a part of this contention, the plaintiff further asserts that there is no rule that the decision maker has to know "the protective category of  [the] person fired."  (Doc. 22 at 22).  In support of his position, the plaintiff cites *Carter v. DecsionOne Corp*., 122 F.3d 997, 1003 (11th Cir. 1997).  (*Id*.)  In *Carter*, the court noted in *dicta* that in an age discrimination case, the plaintiff is not required to show that the decision maker knew that the employee was over 40 at the relevant time.  *Id*.  However, establishing a prima facie case in the FMLA context is different

19

as just noted.  *See Brungart*, 231 F.3d at 799; *contra Lippert v. Community Bank, Inc.*, 438 F.3d 1275, 1282, n.7 (11th Cir. 2006) (stating there was a genuine issue of material fact with respect to whether the decision maker did know that plaintiff was making protected disclosures to the FDIC).

The plaintiff was notified of his termination a mere three days after he informed Belcher that he was going to have surgery and that he would need medical leave.  While the close temporal proximity is troubling at first glace, this does not overcome the deficit of evidence showing Castleberry had any knowledge of the protected activity.  At the time of the initial decision to terminate the plaintiff (September 23, 2010) there is no evidence that Castleberry or Belcher knew that the plaintiff would need surgery, much less that he would be intending to take medical leave.  As already discussed, this remained true up until the telephone call from Belcher to the plaintiff after his second visit to the doctor.  Because Castleberry cannot be "motivated to retaliate by something unknown to him," the plaintiff has failed to demonstrate the requisite causal connection and/or pretext.  *Brugart*, 231 F.3d at 799.  Accordingly, the court cannot find that the temporal proximity alone satisfies this element (causal connection) so as to create a genuine issue of material fact to overcome the motion for summary judgment.

To the extent that the plaintiff argues that Belcher's decision to notify Castleberry about the plaintiff's conduct while no other "pranking" has been reported "over the years," overcomes the defendant's motion for summary judgment, the court disagrees.  (Doc. 22 at 15, 17).  Again, Belcher reported the incident to Castleberry before the plaintiff went to the doctor and, thus, before the plaintiff notified him of the need for surgery and any leave.  Accordingly, the causal connection is absent.  Although Belcher was aware of the plaintiff's lifting injury in mid-

20

summer, that is insufficient to demonstrate a causal connection, especially where the plaintiff had been back to work in the intervening period.  Additionally, there is no evidence to warrant imputing any alleged retaliatory intent of Belcher to Castleberry where he did not exert any significant influence over Castleberry's termination decision beyond a mere reporting of the event.

As a part of this contention, the plaintiff further asserts that it is difficult to believe that Castleberry terminated him without going through the human resources department, which would have led to Castleberry knowing that the plaintiff previously hurt his back and had been to the doctor.  (Doc. 22 at 22-23).  He asserts it is similarly "inconceivable" that Castleberry did not ask Belcher about other incidents of  pranking in the department.  (*Id*. at 23).  While the plaintiff may find these facts difficult to believe, the court must turn to the record to determine the relevant facts.  In doing so, the court finds no reference to Castleberry contacting the human resources department before he made the decision to terminate the plaintiff.  Even if it is reasonable to infer that he did contact human resources, which the court is uncomfortable concluding on this record, that still does not demonstrate that Castleberry necessarily would have learned of the plaintiff's medical visits or his notice to Belcher about needing back surgery.  Additionally, that Belcher and Castleberry did not talk about other instances of "pranking" is not dispositive of this matter. This is particularly true with there is no evidence they discussed the same.

### ii.    Pretext

The next question is whether "the plaintiff demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [its] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.' "

21

*Combs*, 106 F.3d at 1538. "A reason cannot be a 'pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason.'" *Dent v. Georgia Power Co.*, 522 F. App'x 560, 562 (11th Cir. 2013) (quoting *Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). In support of his claim that the defendant's reason is pretextual, the plaintiff argues that (1) the defendant tends to ignore widespread "pranking" (doc. 22 at 17-18), (2) it failed to "equally follow [its] policy" (*id.* at 19-20, 21-21), (3) the defendant's policy on "pranking" was vague (*id.* at 20), (4) the employees perceived that management was lax concerning "safety" (*id.* at 20-21), and (5) his department received numerous safety awards (*id.* at 21).

### a.      Ignoring widespread "pranking"

The plaintiff initially supports his pretext argument by stating that Castleberry knew "that some pranking or horseplay was allowed by the company." (Doc. 22 at 17). He also states there were no definite rules about what was a prank, what was not a prank, what was acceptable, and what was not. (*Id.*) Additionally, according to the plaintiff, the defendant takes action against an employee "only when someone comes in with a complaint.... Otherwise, the company does nothing even though [it] knows it goes on and is a violation of the safety rules." (*Id.*) In support of these contentions, the plaintiff states that he saw co-employee Jerry Bennefield put clear tape in "lances" to plug them up. These "pranks" were witnessed by Huey Lawson, Greg Smith, an oven foreman, and Belcher. According to the plaintiff's interrogatory answers, it was Belcher who took a "complaint from Benny [LNU] about the plugging to Castleberry." (Doc. 22-1 at 2, ¶ 14). He also cites to other "pranks" involving a chicken in a lunch box, locked bathroom doors, rubber ducks being brought to work, and a paper towel lit on fire during a safety meeting. (Doc.

22 at 17-18).

The defendant retorts that it is undisputed that the defendant sets forth its policies in its Rules of Conduct and Safety ("the Rules"). (Doc. 23 at 4). Included in the Rules are examples of prohibited conduct and conduct that could result in termination. (*Id*.) The Rules are provided to all employees when they are hired and they are prominently displayed in the break area at the facility. (*Id*.)

The court accepts, as it must at this juncture, that "pranking" is common at Walter Coke. However, most of the things complained about by the plaintiff that were ignored simply do not raise the safety concern articulated in this case. To the extent the plaintiff notes Bennefield placed clear tape in "lances," the court finds this vague reference insufficient to demonstrate pretext. There is no indication of when this occurred, the safety risk posed by the conduct, exactly what Castleberry was told about the matter, and what, if any, discipline was imposed. Additionally, the record fails to demonstrate any other instance of employees placing wool in the "T" of the welding equipment that were ignored by Castleberry or disciplined in a less serious manner. To the contrary, the record demonstrates Castleberry was unaware of other such instances. (Castleberry Dec. at ¶ 38 (stating that he has "never known of or heard of another employee placing wool in the "T" of a welding machine); Belcher Dec.[19] at ¶ (same); Hewey Lawson Dec.[20] at ¶ 13 (same); Michael Anderson Dec.[21] at ¶ 11 (same); Marlon Hill Dec.[22] at ¶

---

[19]Belcher's declaration is located at document 21-4.

[20]Lawson's declaration is located at document 21-5.

[21]Anderson's declaration is located at document 21-13.

[22]Hill's declaration is located at document 21-14.

11(same); Gregory Smith Dec.[23] at ¶ 13 (same)).

To the extent the plaintiff argues that the same prank was done to him at some unspecified time, the court is not impressed. The plaintiff also stated in his deposition, however, that he did not report the incident because he did not "think [it] was that big of a deal." (Rudy Dep. at 130-31).

To the extent the plaintiff posits the testimony of a former co-worker, Jerry Bennefield,[24] from his unemployment compensation hearing, that he saw approximately ten "pranks" involving the placement of foreign objects in the "T" (doc. 22-9 at 7-8 of 12), there was no concomitant testimony that any other supervisor – especially Castleberry and Belcher – actually observed or learned of the incidents (*id*. at 10-11 of 12). Bennefield's conclusory comment that "[t]here was no doubt in [his] mind" that supervisors saw such incidents is pure speculation. (*Id*.) Bennefield also testified that he personally had never seen anyone "introduce a foreign substance into the welding process." (*Id*. at 10-11 of 12). Thus, this testimony has no probative value concerning the issues presented in this action as to Castleberry's determination or Belcher's involvement.

### b.       Failing to equally follow policy

The Rules at Walter Coke require employees to refrain from interfering with co-workers. (Doc. 21-6 at 3). A violation of this rule can result in "disciplinary action up to and including discharge." (*Id*.) Under the heading of "General Rules of Safety," employees who "engag[e] in any conduct which tends to create a safety hazard" are also subject to discipline up to and

---

[23]Smith's declaration is located a document 21-15.

[24]Bennefield was "separated" from the defendant in October 2009 when his job as a welder helper was eliminated. He was terminated on September 22, 2010. (Doc. 22-9 at 8 of 12).

including discharge. (*Id*. at 5). The plaintiff asserts the evidence shows pretext because "Castleberry allowed pranking to go on without disciplining anyone." (Doc. 22 at 19).

Castleberry testified that no one other than the plaintiff came to him complaining about "pranks" and wanting something done about it. (Doc. 23-10 at 1 of 1).[25] The only time the plaintiff complained was on September 28, 2010, when Castleberry confronted him. (*Id*.) Castleberry did inquire concerning the plaintiff's allegation that others had pulled "pranks" on him. However, the culprits denied the claim when Castleberry inquired. (*Id*.) Castleberry also testified that he would address any complaint on a "case-by-case" basis, considering the risk involved in the incident. (*Id*.)

While the plaintiff correctly demonstrates that the Rules provide Walter Coke with discretion in determining the discipline to be imposed for various violations, there is no evidence in this case that the plaintiff was treated in a manner inconsistent with similar violators. While the court agrees that a failure to follow company procedures is circumstantial evidence demonstrating pretext (*see Bass v. Board of County Commrs, Orange County, Fla*., 256 F.3d 1095, 1108 (11th Cir. 2001), overruled on other grounds by *Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008); *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir.1985) ("Departures from normal procedures may be suggestive of discrimination.")), there is no evidence that Castleberry deviated from any specific procedure in the Rules or as to the plaintiff's termination as compared to another similarly situated individual.

### c.      Vagueness

The plaintiff next asserts that the defendant's policy on "pranking" was vague. In support

---

[25]The full testimony concerning this discussion is found at document 27-2 at 79-82 of 123.

of this, the plaintiff notes that Castleberry defined it on a case-by-case review and events such as lighting a piece of paper on fire during a safety meeting were acceptable.  Accordingly, the plaintiff concludes this evidence warrants a finding that pretext has been demonstrated.  (Doc. 22 at 20).  In support of this aspect of his argument, the plaintiff cites *Watson v. National Linen Service*, 686 F.2d 877 (11th Cir.1982), where the court stated that "[t]he failure to establish 'fixed or reasonably objective standards and procedures for hiring' is a discriminatory practice." *Id*. at 881 (quoting *Brown v. Gaston County Dyeing Machine Co*., 457 F.2d 1377, 1382 (4th Cir. 1972)).

Unlike the present case, in *Watson* there was "considerable confusion surround[ing] personnel procedures at [the defendant's] facility" and the defendant, who "apparently neither followed nor communicated [its procedures] to its employees, changed [them] from day to day." *Id., 686* F.2d at 881.  Here, the Rules were in writing, provided to the employees at hiring, and posted in the break room.  As noted above, there is no evidence of inconsistent application of the Rules by Castleberry concerning events similar to the one leading to the plaintiff's termination. While the court agrees with the plaintiff that the legal premise discussed *Watson* is relevant in addressing pretext, that case is factually distinguishable from his situation.  The present facts do not demonstrate the requisite pretext to overcome the motion for summary judgment.

### d. The employees perception that management was lax concerning "safety"

The plaintiff next argues that pretext is demonstrated by the fact that he "believe[s] that management knew about his FML[A] request and that his termination was based on pretext and they [(Belcher, Castleberry, and Scott)] were all there...."  (Doc. 22 at 20-21).  In support of this

contention, he cites *Sempier v. Johnson & Higgins*, 45 F.3d 724 (3d Cir. 1995), for the proposition that "the court ruled that the employee's perceptions are not always irrelevant. This is especially true when the employee can back up his perceptions with objective evidence." (Doc. 22 at 21). The defendant does not specifically address this claim or authority.

The court finds *Sempier* to be factually distinguishable from this case. In that case, one of the issues concerned the plaintiff's performance. He testified that he performed well and, importantly, "that he never received any unfavorable criticism that his performance was poor or inadequate" during twenty years of service. 45 F.3d at 731. The court also noted that the defendant failed to produce any other evidence of poor performance or specific allegations of his deficiencies. *Id*. This case is different. The plaintiff was terminated for his conduct concerning a single violation of the defendant's Rules. While the court does not and cannot ignore the fact that the plaintiff does not attribute the seriousness to the event that Castleberry does, that perception is not enough to overcome the motion for summary judgment. It must be remembered that the "Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.... Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir 1991) (citing *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted)).

        **e.**        **The plaintiff's department received numerous safety awards**

The plaintiff further notes that his "department has received 40 or 50 safety awards over the years" despite the "pranking" that Castleberry was aware of. (Doc. 22 at 21). Apparently,

although he does not specifically articulate it, this somehow demonstrates pretext.  The defendant does not address this claim.

The fact that the plaintiff's department received numerous awards for not having on-the-job injuries does not demonstrate that the reason for his termination – a distinct safety violation – is not worthy of belief.  If anything, it can be argued that Castleberry's swift and severe handling of the matter demonstrates the importance he places on safety, which oftentimes translates to a safer environment.  However, such an inference is not necessary because the two matters are legally distinct.

In sum, because the court finds that the defendant has demonstrated a legitimate business reason for terminating the plaintiff and he has not adequately demonstrated that the reason was pretexutal, the defendant's motion for summary judgment as to both FMLA claims against Walter Coke is due to be granted.

### iii.     Unemployment Hearing

The plaintiff also argues that because the state court in the unemployment hearing determined that he was entitled to benefits, that ruling necessarily includes a determination that the plaintiff was not terminated for a safety violation.  Accordingly, he concludes that issue is precluded from further review under *res judicata* principles.  (Doc. 22 at 24).  The defendant disagrees.  The matter was addressed by the parties during oral argument and the transcript and order from the state court hearing were received and made a part of the record by agreement of the parties.[26]

The issue of collateral estoppel is a matter of state law.  This court "must give a State

---

[26]The transcript and order are located at document 27 in the record.

administrative agency's findings the same preclusive effect to which it would be entitled in the

State's courts.  *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986)."  *Green v. MOBIS Alabama,*

*LLC*, ___ F. Supp. 2d ___, 2014 WL 457683, *17 (M.D. Ala. February 5, 2014).

> " 'In order for the doctrine of collateral estoppel to apply to an issue raised
> in an administrative proceeding, the following elements must be present:

>> " ' " '(1) there is identity of the parties or their privies; (2)
>> there is identity of issues; (3) the parties had an adequate
>> opportunity to litigate the issues in the administrative proceeding;
>> (4) the issues to be estopped were actually litigated and determined
>> in the administrative proceeding; and (5) the findings on the issues
>> to be estopped were necessary to the administrative decision.' " '

> "*Ex parte Smith*, 683 So. 2d 431, 433 (Ala. 1996) (quoting *Ex parte Shelby Med.
> Ctr., Inc.*, 564 So. 2d 63, 68 (Ala. 1990) (quoting *Pantex Towing Corp. v.
> Glidewell*, 763 F.2d 1241, 1245 (11th Cir. 1985)))."

*Select Speciality Hospitals, Inc. v. Alabama State Health*,112 So. 3d 475, 487 (Ala. Civ. App.

2012) (citing *Hale v. Hyundai Motor Mfg. Alabama, LLC*, 86 So. 3d 1015, 1023 (Ala. Civ. App.

2012) (quoting *Wal–Mart Stores, Inc. v. Smitherman*, 743 So. 2d 442, 445 (Ala. 1999), *overruled*

*on other grounds by Ex parte Rogers*, 68 So. 3d 773 (Ala. 2010)).  Similarly, in a judicial

proceeding,

> "For a prior judgment as to an issue to have a preclusive
> effect on a party's later relitigation of that issue, it must be shown
> that the person against whom the preclusive effect is sought, or a
> person in privity with that person, was a party to the prior litigation
> in which the issue was decided and that the issue for which
> preclusion is sought was actually litigated in the prior action.  See
> *Dairyland Ins. Co. v. Jackson*, 566 So. 2d 723, 726 (Ala. 1990)
> (listing the elements of collateral estoppel)...."

*McDaniel v. Harleysville Mut. Ins. Co.*, 84 So. 3d 106, 111–12 (Ala. Civ. App.
2011).  *See also Walker v. City of Huntsville*, 62 So. 3d 474, 487 (Ala. 2010)
(" 'For the doctrine of collateral estoppel to apply, the following elements must be
established: (1) that an issue in a prior action was identical to the issue litigated in

29

the present action; (2) that the issue was actually litigated in the prior action; (3) that resolution of the issue was necessary to the prior judgment; and (4) that the same parties are involved in the two actions.' " (citations and internal quotation marks omitted)).

*Malfatti v. Bank of America, N.A.*, 99 So. 3d 1221, 1225 (Ala. 2012).

In *Hale*, the court was presented with the question, *inter alia*, of whether an employer in a workers' compensation retaliation claim case can be collaterally estopped from arguing that it discharged the plaintiff for misconduct after there was an unemployment compensation decision in which the hearing officer determined that the plaintiff had not committed misconduct in connection with his employment. *Id*. at 1020. At the outset, the court noted,

> In both *Smitherman* and *Hepp*, our supreme court determined that collateral estoppel could be used to bar a retaliatory-discharge plaintiff from arguing that he or she was discharged for a reason other than 'misconduct connected with his [or her] work' when that plaintiff had been denied full unemployment-compensation benefits under ALA. CODE 1975, § 25-4-78(3)c, because of 'misconduct connected with his [or her] work.'"

*Hale*, 86 So. 3d at 1222. The *Hale* court then noted the plaintiff's arguments in that court stating,

the plaintiff, relying on *Smitherman* and *Hepp*, asserts that the defendant "should be barred from arguing that it discharged him from his employment for violating the attendance, bereavement-leave, and serious-misconduct policies because that issue was decided adversely to [the defendant] by the administrative hearing officer in [the] unemployment-compensation appeal." *Id*.

Rejecting the plaintiff's argument, the *Hale* court stated the plaintiff was awarded benefits after the hearing officer determined he

> had not committed "misconduct," *as defined for purposes of the unemployment-compensation statute*, in connection with his work. Notably, the hearing officer defined "misconduct" for purposes of the unemployment-compensation statute as

30

being 'deliberate, willful, or wanton disregard of the employer's interests or of the standards of behavior which the employer has a right to expect of his employee.' That definition was taken almost verbatim from the definition given to the term "misconduct" in § 25–4–78(3)b by this court in *Davis v. Department of Industrial Relations*, 465 So. 2d 1140, 1142 (Ala. Civ. App. 1984). Thus, the hearing officer in Hale's unemployment-compensation proceeding was tasked with determining—and, in fact, did determine—whether Hale's failure to comply with [the defendant's] policies was a 'deliberate, willful, or wanton disregard' of the employer's policies or interests.

*Id*. at 1024 (emphasis in original). The court then noted:

It is imperative that we understand what the unemployment-compensation determination in favor of Hale was not. That determination was not a determination that the reason for Hale's discharge from employment was not valid under [the defendant's] policies, that [the defendant's] proffered reasons were not legitimate or were pretextual, or that [defendant] terminated [his] employment for the sole reason that he had filed a workers' compensation claim. Instead, that determination was a determination that [he] had not deliberately, willfully, or wantonly disregarded [the defendant's] policies or interests because of compelling reasons that prevented his compliance and that [he] was therefore not disqualified from receiving unemployment-compensation benefits.

*Id*. Rejecting the application of collateral estoppel to bar an employer's argument for termination of an employment in a subsequent proceeding, the court stated:

[T]he conclusion that [the plaintiff] had not committed misconduct sufficient to disqualify him from receiving benefits under the unemployment-compensation statute cannot be used to compel the conclusion that [the defendant] is unable to proffer [the plaintiff's] violation of ... [the defendant's] policies as legitimate reasons for [his] discharge. That is, even if [his] violation of those policies does not rise to the level of misconduct under the unemployment-compensation statute, that fact does not compel the conclusion that [the defendant's] reliance on [his] violation of those policies does not form a legitimate reason for the termination of [his] employment and most assuredly does not compel the conclusion that [the defendant's] proffered reason is a pretext for an otherwise impermissible discharge of [the plaintiff] from [the defendant's] employment in retaliation for filing a workers' compensation claim.

*Id*. at 1025.

The situation in the present case is akin to that in *Hale*. While the determination that the

31

plaintiff is entitled to unemployment benefits necessarily included a determination that he did not

engage in "misconduct" that precludes recovery under Alabama State law, it is not a

determination that precludes this court from considering the defendant's purported legitimate

business reasons for terminating the plaintiff.  That the state trial judge was only concerned with

"misconduct" as defined under the unemployment law is clear from the discussion reflected in

the state court proceedings.  (*See e.g.* Doc. 27-2 at 4-9 of 123).[27]  Additionally, nothing in the

state court's order finding the plaintiff entitled to unemployment benefits indicates a

determination beyond the fact that he was entitled to those benefits.  (Doc. 27-1).  Accordingly,

this court rejects the plaintiff's contention that the unemployment compensation determination

precludes consideration of the defendant's expressed reason for the termination.[28]

> 2.    **ERISA Claim**

The plaintiff also alleges that he was terminated "for asking the 'plan' to pay for the cost

of his surgery in 2010."  (Doc. 1-1 at 6 of 7).  The defendant asserts that the plaintiff cannot

demonstrate a prima facie case, and even if he could, he cannot demonstrate that its reason for

terminating him was pretextual.  (Doc. 20 at 20-22).  The plaintiff retorts that for the reasons

discussed concerning his FMLA claim he has shown pretext and that the defendant's motion is

due to be denied.  (Doc. 22 at 25).

To state a claim under ERISA, the plaintiff must demonstrate that (1) he was entitled to

ERISA's protection, (2) he was qualified for the position, and (3) he was discharged under

---

[27]The court has used the electronic page numbers found at the top of the document.

[28]*Accord Green*, 2014 WL 457683 at *17 (stating "an employer may have reasonable grounds for discharging an employee that fall below the threshold necessary to constitute 'misconduct' in the unemployment benefits context").

circumstances giving rise to an inference of discrimination. *Krutzig*, 602 F.3d at 1235. To prevail on an ERISA interference claim, the plaintiff "must introduce evidence suggesting that the employer's decision was directed at ERISA rights in particular." *Coats & Clark*, 990 F.2d at 1224. If the plaintiff establishes a prima facie case, the defendant must proffer any legitimate, non-discriminatory reason for the termination, and the plaintiff thereafter must demonstrate pretext. *Id*.

Premised on the previous discussion, the court similarly finds that the plaintiff has not demonstrated a prima facie case that Castleberry, as the decision maker, was aware of the plaintiff's decision to exercise any right under ERISA. To the contrary, the record unequivocally demonstrates that he was not aware of any such request. The plaintiff's retort that he notified Belcher (see doc. 22 at 25) is not adequate under the circumstances as discussed already.

## IV.    CONCLUSION

Premised on the foregoing, the defendants' motion for summary judgment (doc. 18) is due to be granted. An appropriate order will be entered.

**DONE**, this 19th day of May, 2014.

**JOHN E. OTT**
United States Magistrate Judge

33